People v Pascarella (2019 NY Slip Op 03700)





People v Pascarella


2019 NY Slip Op 03700


Decided on May 9, 2019


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: May 9, 2019

109076

[*1]THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v
NICHOLAS PASCARELLA JR., Appellant.

Calendar Date: March 28, 2019

Before: Garry, P.J., Egan Jr., Lynch, Clark and Aarons, JJ.


John Ferrara, Monticello, for appellant.
D. Holley Carnright, District Attorney, Kingston (Joan Gudesblatt Lamb of counsel), for respondent.



MEMORANDUM AND ORDER
Aarons, J.
Appeal from a judgment of the County Court of Ulster County (Williams, J.), rendered December 16, 2016, upon a verdict convicting defendant of the crime of murder in the second degree.
Defendant was charged by indictment with murder in the second degree stemming from an incident where he killed his father (hereinafter the victim) after striking him multiple times with a baseball bat. At trial, defendant pursued an extreme emotional disturbance defense. In particular, defendant asserted that he suffered from posttraumatic stress disorder (hereinafter PTSD) due to years of psychological and sexual abuse inflicted upon him by the victim and that his PTSD was exacerbated by his son's allegation that he had been inappropriately touched by the victim. Defendant's first jury trial resulted in a mistrial. Following a second jury trial, defendant was convicted as charged. County Court thereafter sentenced defendant to a prison term of 25 years to life. Defendant appeals. We affirm.
Defendant asserts that the jury's verdict rejecting his extreme emotional disturbance defense was against the weight of the evidence. The extreme emotional disturbance defense "allows a defendant charged with the commission of acts which would otherwise constitute murder to demonstrate the existence of mitigating factors which indicate that, although not free from responsibility for the crime, [the] defendant ought to be punished less severely" (People v Roche, 98 NY2d 70, 75 [2002] [internal quotation marks, brackets and citations omitted]). This defense requires that defendant prove, by a preponderance of the evidence, that he "'acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in . . . defendant's situation under the circumstances as . . . defendant believed them to be'" (People v Harris, 95 NY2d 316, 319 [2000], quoting Penal Law § 125.25 [1] [a]; see People v Reese, 166 AD3d 1057, 1060 [2018], lv denied ___ NY3d ___ [Mar. 12, 2019]; People v Chancey, 127 AD3d 1409, 1410 [2015], lv denied 25 NY3d 1199 [2015]). Whether the extreme emotional [*2]disturbance defense should apply is a matter that rests in the discretion of the jury (see People v Hartsock, 189 AD2d 991, 992 [1993]).
The record discloses that, in February 2014, defendant was advised by a senior investigator with the State Police that his son claimed that he was touched by the victim on his penis and rectum. According to the senior investigator, defendant became visibly upset after learning this information. Defendant's mother testified that, on one day in December 2014, she heard the victim screaming, observed defendant striking the victim with a baseball bat in the driveway and saw blood everywhere. When she went to the driveway, defendant walked away and told her that he was going to turn himself in to the police. The mother described defendant's demeanor as "enraged." Emergency personnel arrived, and the victim was taken to the hospital where he subsequently died. A medical examiner testified that the victim sustained at least four blows to his head.
A police officer, who worked with the Town of Marlboro Police Department at the time, testified that at approximately 12:00 p.m., he had heard a radio transmission about defendant and, shortly thereafter, defendant appeared and said, "I just beat my father to death with a baseball bat. I'm here to turn myself in." The police officer stated that defendant appeared "very calm." A deputy sheriff with the Ulster County Sheriff's Office stated that he arrived at the Town of Marlboro police station and arrested defendant. When the deputy sheriff advised defendant that he was named in connection with an assault, defendant responded, "[H]e's not dead? He better be, his brains were hanging out." The deputy sheriff also stated that defendant appeared "[r]elatively calm."
The People also admitted into evidence transcripts of phone calls made by defendant while he was in the Ulster County Jail to his wife. In a December 29, 2014 call with his wife, defendant said, "I told you I wouldn't fail. It took a while, but I realized the other day what I had to do. I realized two weeks ago what I had to do. I made sure your apartment was done." Defendant then stated that he "made [the victim] suffer" and that he had "promised [her] that would happen." He also said that he "would do it again" and "would do it every single day with no hesitation and no remorse because [of] what [the victim] did to [them], and what [the victim] did to [his] son." In another phone call, defendant told his wife that he "by no means" regretted what he did, describing it as "the proudest moment of [his] life."
Defendant's psychiatric expert evaluated defendant and testified that he learned that defendant was the subject of verbal and physical abuse when he was a child and an adolescent. Defendant's expert stated that defendant suffered from complex PTSD and explained that someone like defendant who was abused and was raised in an abusive environment had "no area of [his or her] life that [was] free of . . . stresses, from the trauma." Defendant's expert further stated that the suicide of defendant's brother made his PTSD worse. Specifically, defendant "was wracked with guilt" because he felt that he was supposed to be his brother's protector and that his brother's death was a profound loss for defendant. Defendant's expert testified that when defendant learned about his son's claim of being inappropriately touched by the victim, defendant became distraught because he felt that he did not protect his son, and the memories of his own abuse resurfaced. Defendant's expert ultimately opined that when defendant struck the victim, he acted under the influence of an extreme emotional disturbance and that, because of his PTSD, he had a profound lack of control on a chronic basis and could not make good decisions. Defendant's expert also opined that defendant's PTSD was "the only thing that [made] sense of his behavior" with respect to the incident in question and that his loss of control could last one minute or an hour. According to defendant's expert, the attack on the victim was "a plan of desperation" and that "his capacity for planning was compromised at that time."
The People's expert, on the other hand, opined that he could not make a determination whether defendant suffered from PTSD because the information provided by defendant "changed so much over time, every time the story was told, it was given in a different way," and defendant did not cover all of the categories for PTSD. He explained that "PTSD [was] a frequently faked illness" because of the potential for secondary gain, such as less prison time. The People's expert [*3]concluded that defendant did not suffer from an extreme emotional disturbance when he killed the victim because he "was in control and was aware of what he was doing, he was aware of his surroundings, he was aware of the environment, he was aware of the consequence of his actions, he was aware of his guilt, he was aware of the potential ramification of his guilt." According to the People's expert, defendant had indicators of a high degree of self-control, and the statements made by defendant in the recorded telephone conversations reflected that defendant had planned the attack. The People's expert noted that defendant had worked toward finishing the apartment for his wife and son because he knew that he would not be available, thereby showing that he was aware of the potential consequences of his actions. The People's expert also stated that defendant sat for 20 or 30 minutes in his car waiting for the victim before striking him, which "demonstrate[d] a high degree of self[-]control and . . . deliberate character of the plan of his attack." The People's expert testified that defendant had full command of his faculties, as demonstrated by the fact that he surrendered himself to the police and that he was able to articulate the details of the incident with the victim. Finally, the People's expert stated that a person acting under an extreme emotional disturbance does not take pride in a violent act that just occurred, as defendant had, and will usually be overwhelmed by it.
Given the expert testimony offered by defendant, in our view, a contrary result would not have been unreasonable (see generally People v Danielson, 9 NY3d 342, 348 [2007]). That said, the jury was presented with competing expert opinions as to whether defendant suffered from PTSD and acted under an extreme emotional disturbance, and it was entitled to credit the opinion offered by the People's expert (see People v Reese, 166 AD3d at 1060-1061; People v Benson, 119 AD3d 1145, 1148 [2014], lv denied 24 NY3d 1118 [2015]). Furthermore, the People submitted evidence demonstrating that defendant exhibited a high degree of self-control, that the attack on the victim was planned and deliberate and that defendant had a calm demeanor shortly after the attack (see People v Wagner, 178 AD2d 679, 680-681 [1991]). Viewing the evidence in a neutral light, we find that the verdict rejecting the extreme emotional disturbance defense was not against the weight of the evidence (see People v Williams, 130 AD3d 1323, 1326 [2015]; People v Chancey, 127 AD3d at 1411-1412; People v Hoke, 276 AD2d 903, 904 [2000], lv denied 96 NY2d 801 [2001]).
Defendant contends that he received the ineffective assistance of counsel because his expert was subject to impeachment on further cross-examination after it was discovered that certain notes prepared by the expert when he interviewed defendant were not timely disclosed to the People. We disagree. County Court characterized the late disclosure of these notes as "inadvertent" — a characterization that was not disputed by either party. Although the expert admitted that he was aware of the requirement to turn over all material, he also stated that he was not asked to disclose his notes and would have done so if he had been asked to do so. On redirect examination, the expert reiterated that he would have provided his notes had defense counsel asked for them. Indeed, defense counsel, in rehabilitating the expert during redirect examination, appeared to deflect any blame placed on the expert by commenting that it was her fault for not asking for them. Furthermore, in our view, the few questions posed by the People to the expert about the failure to disclose his notes did not wholly undermine the expert's credibility. Also contrary to defendant's assertion, the prosecutor did not belabor this issue during summation, inasmuch as he merely stated that the expert had to be recalled because some notes were not turned over. Moreover, the prosecutor did not argue that the expert was unworthy of belief based on the late disclosure of notes and, in fact, urged the jury to accept part of the expert's testimony. Based on the foregoing, we cannot say that the failure to disclose the expert's notes, thereby subjecting him to additional questioning, constituted ineffective assistance. Considering the record in its entirety, we are satisfied that defendant received meaningful representation (see People v Wilbur, 108 AD3d 878, 880 [2013]; People v Wells, 101 AD3d 1250, 1255 [2012], lv denied 20 NY3d 1066 [2013]).
We are unpersuaded by defendant's argument that the sentence was harsh and excessive. Given the heinous nature of defendant's acts and his lack of remorse, we perceive no abuse of discretion or extraordinary circumstances warranting a reduction of the imposed sentence in the interest of justice (see People v Reese, 166 AD3d at 1062; People v Lebron, 166 [*4]AD3d 1069, 1074 [2018], lv denied 32 NY3d 1174 [2019]; People v Cutting, 210 AD2d 791, 793 [1994], lv denied 85 NY2d 971 [1995]). To the extent that defendant argues that he was prejudiced by certain statements made during sentencing, such argument is unpreserved for our review in the absence of a timely objection thereto (see People v Rosado, 300 AD2d 838, 840-841 [2002], lv denied 99 NY2d 619 [2003]) and, in any event, is without merit. Defendant's remaining contentions have been considered and are unavailing.
Garry, P.J., Egan Jr., Lynch and Clark, JJ., concur.
ORDERED that the judgment is affirmed.